Good morning. We have a crowded calendar this morning, as you can tell, so that's why you've got the big courtroom. We'll proceed and start with, who's on first? I guess it's Pacific Lumber Company. Yes, sir. Thank you. May it please the At the outset, dispel a notion that this Court needs to decide whether or not the Buchanan standard for dealing with fee shifting applies to this case. It is our submission that under the standard that appellees concede is the correct one and the standard that the district court applied in this case, the order awarding fees simply cannot stand. The Ruckelshaus standard, which has been adopted in this circuit for the where appropriate types of statutes such as the Endangered Species Act that is applicable here, requires that there be some success on the merits before a party becomes eligible for a fee award. In the Ninth Circuit, in Carson Truckee and in Marbled-Murlett v. Babbitt, the 1999 decision has adopted that standard and added that the dominant consideration is whether litigation by a party has served the public interest by assisting in the interpretation or the implementation of the Endangered Species Act. I don't quite understand. You think that Marbled-Murlett continued Carson Truckee? I think the case rejected and said Carson Truckee is no longer guidance for the Ninth Circuit. It certainly did, Your Honor, with respect to a defendant claiming fees. But I – and admittedly, that was a case that dealt with an application by the Pacific Lumber Company as a defendant for fees. We noticed the parties were familiar. But I think that the concept that was expressed there is still the law in the circuit, both with respect to Carson Truckee, again, not a plaintiff's case. But it is the standard that the district court here applied. So we're willing to accept that that standard, the standard that the district court applied. Well, that would be a higher standard. A harder standard. They don't have to go that far. I'm sure you'd be willing to accept it, but now you're on the other side. Well, the district court in this case, on page 8 of her opinion, stated, Plaintiffs are thus entitled to attorney's fees if the TRO and the September 3, 1999 injunction provided some degree of success on the merits, citing Ruckelshaus and then added, to do so, the interim injunction must have furthered the implementation and interpretation of the Endangered Species Act. You said a higher standard, relying on Carson Truckee, but the other case suggests she may have been wrong. I'm not prepared to accept that that's necessarily a higher standard. I think that as I, and if we read Ruckelshaus' case It's an additional element. It's an additional element, yes. But as we understand that element, it assists in interpreting whether or not there has been the appropriate degree of success on the merits. And I don't believe it's a semantical difference, but I think it adds guidance to the decision that the Court must make in terms of whether or not the requisite degree of success on the merits has been achieved. And that can be either in the interpretation or implementation of the statute? Yes. Or disjunctive, right? Yes. Here we have a temporary restraining order, which we submit did not constitute a ruling on the merits, and then we have the September 3 hearing. Wait a minute. You just brushed over that, not a ruling on the merits. Judge Henderson went much further than he had to on the TRO and made some substantial, at least as far as his order is concerned, it looks pretty substantial. He's talking about interpretation of the Act, which goes away. Why do you say he didn't rule on the merits? Well, I would say it would be – there's no question that he went farther than he went – than he needed to go. He also did it ex parte. I – Well, you had an opportunity to brief this, as I understand it. We had an opportunity to brief – we submitted an initial brief on several hours' notice dealing with the claim that the plaintiffs, appellees, argued, which was that formal consultation had commenced. Judge Henderson then indicated that he thought that maybe there was no difference between informal and formal consultation. This was not an argument that the plaintiffs had made. And we went back and prepared subsequent briefs. But he made his decision before the briefs ever got to him. So his ultimate temporary restraining order adopted his view without the benefit of our briefing. I can't say whether or not that made any difference. May have considered it. May not. We don't know. But that is the fact. But is it fair to say that by the time that the temporary restraining – temporary injunction was developed, that she incorporated what Judge Henderson did in the TRO? She adopted the same reasoning, yes, on September 3. Okay. The reasoning that, in her opinion, informal consultation and formal consultation as the regulations interpret them are the same. Yeah. That's a position that the services implementing the Endangered Species Act do not agree with and indicated to the Court. Just to extend, you focused on what your state of briefing opportunity was with Judge Henderson, what happened in terms of your opportunity to address the merits before the September 6th. Well, but in terms of the injunction, that was – there was further briefing done for Judge Patel before the September 3. So whatever may or may not have gotten before Judge Henderson, you had a chance then with more time to put it in front of Judge Patel. Yes, we did. Okay. And on September 3, the hearing proceeded on – with a discussion about whether or not informal and formal consultation were the same. And then the judge indicated quite clearly that there was a problem with the 10-day rule, that she felt that to avoid that problem, that preliminary injunction would be issued, but that she was unable to resolve some critical issues at that time for which evidence would need to be taken on the subject of whether or not coho salmon were present, whether or not logging would constitute an irretrievable commitment of resources. And at the time all of this was proceeding, refresh me, there was logging going on, correct? There was logging – well, when – That was then halted by the TRO. The TRO – yes, there was. I mean, we – the logging stopped with the issuance of the temporary restraining order. On September 3, Judge Patel indicated that she would need evidentiary hearings to resolve the issues of whether or not a preliminary injunction would be appropriate under the circumstances. And that, as this Court knows, she didn't resolve that issue until March 15, 1999. In the meanwhile, the biological opinion process was going on. The biological opinion process was proceeding. Everybody knew that, but still you guys were fighting. Yes. I understand this is a little mixed up, but is it your position that in fact a preliminary injunction was entered at that time subject to modification after evidence is taken? It's an – technically it was a preliminary injunction, but it was, as Judge Patel indicated, she was issuing it because of the 10-day rule subject to determining whether or not it was appropriate if the facts justified it. Yes, but she says she's issuing a preliminary injunction. That's true. And – but she's also saying that I'm doing this on the basis of the affidavits. I'd like to see witnesses. I may change after I see the witnesses. We didn't – I don't understand it that way. I certainly – we agree that a preliminary injunction was issued. We also – That's an appealable order. Well, we – it was a – we didn't believe that the process was complete. In other words, the judge says I'm going to continue – I'm going to set hearings to take evidence. I will keep the TRO in effect by converting it to a preliminary injunction. It seemed to us at the time that to try and take an appeal while the process was going forward with respect to evidence as to whether or not the injunction should be issued, she stated, for example, that it would not be appropriate to issue an injunction if there were no coho salmon present and that the hearings would be focusing on that issue to determine whether or not that was the case. I quite firmly believe that were we to have come to this Court at that point, this Court would say, why don't you wait and see what happens on September 23 and 24 with respect to evidence as to whether or not this injunction is going to be truly in effect or whether or not it's unnecessary. When did the – when did the evidence – I lost my line of markings here. When was the evidence taken? The evidence was taken on September 23 and 24, 1998, and again on October 21 and 22, 1998. And quite frankly, we expected a ruling very shortly after the conclusion of the evidence on October 22, 1998. That didn't happen. What did happen was that within two weeks, the services indicated that formal consultation had in fact commenced. We advised the Court of that fact. Pacific Lumber Company agreed that that was the case. We also knew that the decision of the services had to happen before March 1, and that was the date the funding for the Headwaters transaction would expire. We also knew that there was a maximum 90-day period during which time formal consultation could proceed under the Act. So there – it was time-constrained at that point. And we also knew that the biological opinion would issue and the case would become moot. And that's what happened. Moving to what was accomplished, I think in terms of the test that this Court must apply, there must be some impact, whether it's an interpretation of the Act or an implementation of the Act, that furthers the purposes of the ESA and I believe also, I would submit, represents success on the merits. What did happen? Counsel, wasn't there a ruling that informal consultation triggered the requirements of the Act? Wasn't that one of the rulings that was secured? That was secured and then mooted. But yes, and that – Well, maybe mooted, but it was secured before the biological opinion was rendered. But I would suggest that's one of the problems, is that the services disagree with that. There is no authority anywhere in this country to support that notion other than the TR, temporary restraining order. But the fact that you think it is wrong doesn't change the fact that it was entered, does it? It doesn't change the fact it was entered. But it does – what does change the fact of its impact is that it really wasn't articulated in terms of findings, and there were no specific findings until March 15th in an opinion that has been mooted and vacated by this Court. What we have is a temporary restraining order, a September 3 hearing in which the Court indicated that it was not prepared to make a final decision, kept the preliminary – converted to a preliminary injunction so that the 10-day rule could be complied with. But didn't the preliminary injunction essentially accomplish what Epic wanted? It was a – if that's all they wanted, if all they wanted was a temporary cessation of logging, it was a very minimal achievement. But I would add further that it did not aid in the interpretation of the Endangered Species Act, and it certainly did not further its purposes. And this Court, in its 1996 Murlett decision, indicated that informal consultation between the services and, in that case, Pacific Lumber Company, but applies obviously to anybody, is to be encouraged so that potential conflicts between the – an applicant and the agency can be worked out. If you are to treat informal consultation the same as formal consultation, you then bring in the 7D restrictions. In this case, it was – Judge Patel concluded that meant a cessation of harvesting. You trigger that cessation of activities at the time when only informal discussions between the applicant and the agency are taking place. Counsel, aren't you re-arguing the merits of your position when you make this pitch to us? No. I believe in terms of – in terms of whether or not the purposes of the Act are furthered, which is part of the test this Court is to apply, what purpose is there? What is the beneficial – what possible beneficial purpose is there in triggering the restrictions of Section 7D at the time when informal consultation commences as opposed to formal? That goes to the merits. We have to – you're saying, well, there's no precedent for this, but the fact is the events overtook a legal resolution of that. So in the meanwhile, they achieved a cessation of existing logging and prevailed, at least to that extent, and then you may have, had it been fully litigated, been able to win, and then we'd be talking about prevailing party, I suppose. But your suggestion is because you think that your argument on the merits is better, we should look through the mootness issue and actually say, yeah, you're more likely right than they are, and therefore, they didn't get a benefit on – they didn't, you know, advance the purposes of the Act. Well, as I understand, the purposes of the Act must have a broader application than just a temporary restraining order that, for a very short period of time. Does this apply to others? Is this a theory that other potential applicants must comply with? And is that beneficial to the ESA or its interpretation? And I would suggest not. Are you suggesting, counsel, then, that if the outcome is not – does not affect anyone other than the parties, it doesn't serve the purpose of the Act? Is that your argument? It's not the only argument. But I think in terms of whether – if you're talking about lends or advances the interpretation of the Act, to me, that's a concept that is more expansive than a very narrow application in a given instance. It must have some greater relevance to the application of the Act. If, as Epic asserted, this logging was harming the environment, wouldn't cessation of that logging be consistent with the purposes of the Act? If, in fact, that had been established. But, of course, it wasn't. It wasn't at the hearings and – It wasn't established sufficiently for TRO to be in a preliminary injunction. The biological opinion rejected that theory. Which – so we have – it is a very complicated procedure. I understand that. But I think there's also, from our perspective, an inherent unfairness in the way this rolled out. Ultimately, it was determined by the agencies after three years of study that there was no adverse impact. We have, which we would submit as it was a unique interpretation of the law upon which the temporary restraining order was granted, we have a situation where it becomes mooted because the district court simply didn't make a timely decision on the merits, which we could not appeal on the merits. No, you're – you're – wait a minute. You're saying it's unfair, and I understand your concern and what you're saying about the rightness, if you will. But as Judge Wallace said, you did have an appealable order, and you didn't – you elected to go with the flow, as it were, and – and I'm not criticizing you for it. But that's a choice, a litigation choice that you made. And meanwhile, events both inside and outside the courtroom are moving forward. And what the plaintiffs have obtained is relief. And you're saying, well, A, it didn't – it ultimately would have been proved both factually and legally wrong. Therefore, all of that that they had prevailed on should not be compensated. I would question whether our order was appealable. We certainly had no findings on September 3. We didn't have findings by the district court until March 15th. No written findings. No written findings. And no oral findings on anything other than informal consultation and formal consultation were the same. There was no – there were no findings on the factual predicates for whether 7d would be triggered, whether there was an irretrievable commitment of resources, whether there was no request for written findings or no request for additional findings. I understand why you thought the posture of the case wasn't. But you – these litigation decisions, I – those of us that tried lawsuits and my colleague tried more than I, but you always make these decisions. But what do you say to – that you could have asked for additional findings at the time? You didn't. Doesn't that foreclose you from the argument now? Well, the – we would – the response would have been from Judge Patel, and she indicated it on the record at the time, I'm not in a position to make those findings, because I want to hear the evidence. And therefore, I'm having hearings set two or three weeks hence to do that. And that's, in fact, what occurred. I notice that my time is up. Thank you very much. Thank you. Good morning, Your Honors. Richard Pearl for the Plaintiffs' Appellees, Environmental Protection Information Center, and Sierra Club. With me at counsel table is Brian Gaffney, one of the plaintiffs' merits attorneys. And also in the courtroom is Sharon Duggan, their other primary merits attorney. To start off with this thing that's troubling me, I guess I'm somewhat sympathetic with trial lawyers that have to make decisions, and then the decision they make that appears to be right at the time comes back to haunt them later on. It seems to me clear that Judge Patel was not prepared to make what she said – thought was going to be a full preliminary injunction. She wanted to see the witnesses, but she was willing to extend the TRO, and then she phrased it for reasons dealing with the rules that she would call it a preliminary injunction. Now, everybody who's sitting at counsel table knows what's going on. We're going to hear evidence, and then she's going to decide whether she's going to change that preliminary injunction. So what we're saying to counsel is, in spite of that, and everybody knows what's going on, if you didn't appeal that preliminary injunction at that time, then you're foreclosed now from arguing the merits that she decided because it became moot. So he doesn't get any chance at all because of the posture of the case to say, look, she was wrong on the merits, so therefore it didn't further the interpretation of the statute, and you're not entitled to attorney's fees. Now, how do we deal with a situation like that? Okay. Let me back up just a second, and I don't mean to be avoiding your question because I want to get back to the facts. But the case law, and I would urge the Court to take a look at the big picture, the case law is uniform from both this circuit and the other circuits that a preliminary injunction or even a TRO is sufficient to confer prevailing party status on the party that obtains it, even if the defendant never gets a chance at appellate review. In the LSO case, for example, in the Ninth Circuit, in this Court, it was a TRO that became immediately moot. There's no appeal from a TRO. The defendant never had a chance to challenge it on appeal. This Court held that that was – that did not negate the plaintiff's prevailing party status. I would urge the Court – there are a number of other of the – of this line of cases that involve situations where things similar to this case occurred, where there was some procedural glitch that might have affected the appeal. And nonetheless, the Court said even though the defendant didn't get a chance to have the initial determination heard on appeal, the plaintiff is still the prevailing party. And the case most specifically I would refer the Court to is the Associated General Contractors case. But even assuming this case law and that somehow the defendant had some right to have this appeal heard before the case became moot so that the plaintiff might not have been the prevailing party, I'd like to go back to this circumstance. What Judge Patel decided, and I think the Court recognized it the first time around in this case, was not that she couldn't make a decision on a preliminary injunction. I believe, Judge Wallace, you said it right the first time when opposing counsel was up here. What she said was the declarations were sufficient to grant a preliminary injunction. That's the language she used. But I'm not comfortable with that. I'm going to bend over backwards and I want to hear before the site but instead of deciding it solely on the declarations, I'm going to hear live testimony because of this conflict. And so she scheduled live testimony and she said, if that live testimony shows me something different than what I believe the declarations have shown, I'll modify it or revise it or dissolve it. She heard that live testimony. It obviously did not change her view. In fact, it reaffirmed her view. And at that point, clearly, Pacific Lumber could have filed an appeal. Wait a minute. At what point? Five months later when she finally? No, it was only the next month. I thought it was in March that she finally made her decision. She finally made a decision, but she concluded the hearings in the end of October. Right. And didn't modify or dissolve the injunction after hearing it. But there had been no change on the record from the very beginning until March. She held hearings and heard evidence, but she didn't make any findings on the evidence. No, I'm not saying she did. So there's no difference as far as the record is concerned of her opinion from September 3rd to March 3rd, till the March order. No, she did not make a finding between September 3rd on the record and March when she made the written findings. So the posture for Palco would have been to come to this Court and say, there's a preliminary injunction without support or without adequate support, it's wrong on the law, it hasn't been modified, we can't afford to wait any longer, our logging operations, and you would have argued premature, premature. We might have argued premature, premature, and we might have been wrong. We don't know what the issue would have been at that time. So, I mean, that's just speculation as to whether we would have argued it was premature. But as I think they said in their argument, they chose at that point not to appeal it. They chose to wait until the biological opinion issued and proceed with the case in front of the trial court, rather than seek an appeal. Let me ask another question. Do you have do you agree that the standard is the Carson case still and that you have to prove that you advanced the purposes of or interpretation of the act? We argued in the district court that Carson-Truckee had been, at least in terms of whether we had to prove implementation or interpretation, had been superseded by Marble-Marlette. The district court rejected that argument and imposed a higher standard on us. We believe that we easily meet the Carson-Truckee standard so that it's irrelevant whether there are purposes in this case. So how did you do that? How do we meet that standard? Both in terms of interpretation and implementation. To be candid, the implementation is far stronger. This is exactly what the plaintiffs accomplished, exactly what the Endangered Species Act provided should occur, which is they kept the trees in the air and the silt out of the water while the services considered what alternatives were available to allow Pacific lumber to continue logging but, on the other hand, maximize protection for endangered species. Had they not ---- Counsel, what's your response to opposing counsel's argument that the biological opinion proved that the TRO should have never been entered? The biological opinion proved nothing of the sort, Your Honor, and I think the district court found that. What the biological opinion said was with the restrictions that we have imposed, there will be no unlawful jeopardy to the species. But it was not ---- the biological opinion did not say that the plan submitted by Pacific lumber as they were submitted would not have harmed species. What it said was with these restrictions, it will not harm them. And Pacific lumber admitted that the biological opinion imposed additional restrictions on them. Secondarily, we would argue, and that was a factual decision, the biological opinion is a 600-page document. It doesn't say anywhere in it specifically we're approving the plan as offered versus we're not approving it as offered. It has to be read and considered. And when it was read and considered by the trial court, the district court determined that it had. But even if it hadn't, and we get in now into a line of cases like the animal lovers case which we've cited here and other cases, even if it hadn't changed it, what the purpose of the Endangered Species Act is to preserve alternatives for the services. And whether they needed to have those alternatives preserved, whether those alternatives whether logging would have undercut their alternatives or not is not the issue. The issue is they need to be preserved so they can consider them. And that's what this lawsuit accomplished regardless of what the biological opinion did. But as we said, the evidence before the district court was clearly that the biological opinion had imposed greater restrictions than were present in Pacific lumber's application. I'm sort of persuaded that your adversary has a good point that the preliminary injunction as such didn't do any more than preserve the status quo. That is, stop the logging until we decide what's going to happen. So it seems to me, therefore, that the burden that you had to get attorney's fees would be showing something towards the implementation or interpretation of the act. Counsel says that if I'd come up on appeal, I would have demonstrated what the court thought, that is, the informal, private, public, that those issues are wrong. And therefore, there's only preservation of the status quo. What they claimed was an interpretation of the act was really wrong. But I was foreclosed from doing that because of the nature of the issue. Now that, it seems to me, is the argument, how it comes out is another issue. But you bring up another point. In addition to that, on page 44 of your brief, where you claim that, of course, the case has had an important interpretation because it's now in the handbook on application of section 7D of the Habitat Conservation Planning Process. And you attach a copy of it and ask us to take judicial notice of it. How does that play out? Explain to me how the case itself has had this, did it directly have it? That is, did they say, we had, Judge Patel was right, Judge Henderson was right. We're going to change the handbook. Or is it just a circumstance they did and there was no relation to the case? Can I back up one point on the status quo, just, and I'll get to your question. I believe we did change the status quo because they were logging when this lawsuit started. I read, I read your, that was the argument and I have. Okay. In terms of the handbook, the handbook says that we, refers to the district court's decision in this case, and says we are going to change our procedures accordingly. We're going to adopt our procedures to conform to the rulings that were made by the district court on informal consultation. In that respect, the, this lawsuit has changed the interpretation of the act by the services. It has changed the way other persons and entities in the position of Pacific Lumber perceive when formal consultation begins and when informal consultation, the effect of informal consultation. The fact that the district court's written opinion was vacated does not mean that its opinion as to what the law is, is any less known to the, well known to the parties that are interested in this issue. As is Judge Henderson's opinion in his written TRO. So in obtaining both the written TRO and Judge Henderson's rulings on the merits at the preliminary injunction hearing, they have informed both the services and other timber companies and environmentalists of what the northern district of California at least sees as the proper interpretation of the act. And was, you say this was a causal connection, that the handbook itself was actually changed because of this case? Right. It, it cites the court's opinion. So I don't. Opinion or? The vacated opinion. But nonetheless, it's still the court's opinion. Well, it was in the preliminary injunction. I mean, she's. Right. And it was in the TRO. Right. Exactly. So I, and there were other issues that Pacific Lumber raised that were important here, too. I mean, initially Pacific Lumber raised the issue that Section 7D doesn't apply to private actors. That was an issue they raised before Judge Henderson, and he rejected it. There were two requests for amici from the Pacific Lumber Foundation and another lumber industry wanting to intervene in the case, at least one of them on this issue, on the private actor issue. And Judge Henderson rejected that issue. In this, in that sense, this case also aided in the interpretation of the act. But I'd like to go back to the preserving the status quo, because I'm not sure that analysis fits environmental statutes like this. First of all, I think factually, and I don't mean to belabor the point, they did change the status quo. But even if Pacific Lumber hadn't stopped logging, in this case, keeping them from logging is what the case was all about. This wasn't keeping things in place until something further could be done. Keeping them from logging is what plaintiffs contended and the district court found is what the Endangered Species Act required. There's no further relief we could have obtained other than keeping them from logging, which, as you perceive it, Judge Wallace, is maintaining the status quo. But that was the goal of the lawsuit. And so simply saying it was maintaining the status quo doesn't mean you're prevailing party, I don't think, really answers the issue of whether we prevailed here and whether we accomplished what the Endangered Species Act was designed to accomplish. That's what this lawsuit was about. That's what the Endangered Species Act was about, preserving the status quo so the services could consider the biological opinion with the full range of alternatives available to them. So I wanted to back up on that point. Unless there are other questions, I think we answered the questions about whether the order was an appealable order. I believe it was. Again, the fact that Pacific Lumber didn't get an appellate determination on the merits is not unusual in fee-shifting cases, as we've shown. There is this long line of cases where the defendant doesn't get an appellate determination on a preliminary injunction or TRO, and it doesn't affect the plaintiff's right to fees. And the reason for that is a policy reason that I would ask this Court to consider. The reason for that is that, as the courts have interpreted fee-shifting statutes, Congress felt it was more important to award fees to plaintiffs who obtained TROs or preliminary injunctions and enforce the statute than to deny them because the defendant did not have a right to an appellate review of that determination. That the decision should be based on the determinations that were made before the case became moot and not on speculation about what might have happened had the case not become moot. And that those policies are very important, because particularly in situations like the Endangered Species Act, where everything is happening on a very fast timetable, this is likely to recur time and time again. If plaintiffs can't – plaintiffs and their counsel who obtain preliminary injunctions cannot – that become moot before they can be reviewed, cannot obtain fees because of some – because the case becomes moot, because the biological opinion issues before the case is reviewed, because the trial court fails to issue a finding or whatever happens, if they cannot obtain fees for enforcing the Act because of those circumstances, they're not going to bring these cases, because these cases move on fast tracks and fast timetables. And getting that kind of relief is what these cases are all about. The plaintiffs did nothing here to delay any issuance of findings or make this case non-appealable. As we submitted, it was appealable. The defendant, P.L., could have appealed. It could have moved to modify or stay the TRO. It didn't do that. It could have appealed the September 3rd order, which was – sufficiently met all the requirements of Rule 65. It could have appealed at the close of the evidence in October, after testimony had been heard on the – on what was the disputed factual issue. It chose not to. That circumstance should not be sufficient to undermine an award of fees to the plaintiffs who have otherwise enforced the purposes of the Act. In calculating the fee, the Pacific Lumber suggests that there may be a – I don't say it's a way of a compromise, but it at least – it has a tendency to even things out somewhat of suggesting a cutoff date earlier than what the district court said. What is there after the – what fees are charged after October 22? After October 22? One important point, which I forgot to mention on the injunction and the appealability, is there was a stipulation entered into in November, which allowed Pacific Lumber to take some remedial steps in the THP's area, stipulation to modify the injunction, which expressly acknowledges that there was a preliminary injunction entered and that it was in effect. That's the stipulation and modification entered November 8th, I believe it is, and it's referred to in our brief and in Judge Patel's opinion. After that, there was briefing on cross motions for summary judgment. And here I think it's very important to recognize Pacific Lumber, rather than appeal, moved for summary judgment on the issue of whether 7D applied and the other issues they had raised. At that point in time, Plaintiffs' counsel could not simply say, oops, the case is going to become moved, we're not going to brief it. They had to file opposing briefs to sustain the victory they had won on the preliminary injunction. So that's the work, the primary work that was done after October was the summary judgment briefing. On the other hand, they cross moved for summary judgment because the case had not yet become moved, again, seeking to reaffirm the decision in the — on the preliminary injunction. That's the bulk of the work that was done after October, and that's what Judge Patel found. This case is directly — is directly controlled, I would submit, by the Watson decision, which had exactly the same effect. We have that in your brief and you're into your time. Yes. Thank you. Okay. Thank you. I'll give Pacific Lumber a minute or so to reply. Thank you, Your Honor. I would, in terms of the policy, one point, and that is if a temporary restraining order under the Endangered Species Act, which admittedly is a — has a very low threshold for issuance because the well-established policy is that the public policy shifts in favor of the species at that stage of any proceeding involving that act. If all you need to obtain is, like the plaintiffs here, a temporary restraining order, then that ultimately will entitle you to a fee award. I would submit that the standard of Ruckelshaus has been expanded even further and much beyond what the Supreme Court has indicated is an appropriate measure for fee shifting, well beyond what the statute intended. I don't believe that that's the intent of Congress. I don't believe that the Supreme Court has viewed it in that way. The fact that the plaintiffs here obtained a preliminary injunction, they maintain they got everything they want. They didn't get everything they want. They basically — and they argued this in their motions when Pacific Lumber moved to have the case dismissed as moot. They argued that the biological opinion was flawed. They argued that the incidental take permit should not be issued. Those were rejected by Congress. You're not arguing that a party must get everything it is seeking in order to be entitled to attorney's fees, are you? But I — I would agree with that. But I agree that there must be a substantial victory, so to speak. They must get something significant. Here, all they had was a temporary restraining order. I know I don't want to repeat myself, but the ultimate issue, and that is whether or not there were coho salmons present, whether or not there would be the irreconcilable commitment of resources, didn't occur. Nothing changed with respect to the Habitat Conservation Plan and the incidental take permit because of this lawsuit. If they had — could come and say, look, we filed a lawsuit that retained a temporary restraining order, and that resulted in a change of some consequence in this permitting process, perhaps they would have something to talk about. But there was no change. The incidental take permit issued as it was. The Habitat Conservation Plan, there were no additional conditions opposed upon Pacific Lumber Company, and the timing of the process remained the same. Is it your position, then, that contrary to what opposing counsel said, the biological opinion didn't impose additional restrictions? That is our position. I believe that's the fact. The conditions that Pacific Lumber Company was going to have to operate under had been established well before any of this. Thank you very much. Thank you very much. Thank you, counsel. The case just argued is submitted, and we will adjourn. All rise.
judges: Wallace, Fisher, Rawlinson